

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| THE HALL PATENT GROUP, | § § | |
| Plaintiff, | § § | |
| v. | § | No. 3:05-CV-661-M |
| INDUSTRIAL NOISE CONTROL CORP., | § § § | |
| Defendant. | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court are (1) Plaintiff's Motion for Partial Summary Judgment, filed March 1, 2006, (2) Defendant's Motion for Summary Judgment, filed March 1, 2006, and (3) "Plaintiff's Expedited Motion to Strike Affidavits filed by Defendant INCC", filed March 8, 2006. The Court **GRANTS** Plaintiff's Motion to Strike. Plaintiff's Motion for Partial Summary Judgment and Defendant's Motion for Partial Summary Judgment are **GRANTED IN PART** and **DENIED IN PART**.

FACTUAL BACKGROUND

This is a suit for patent infringement of United States Patent Nos. 5,012,949 ("the '949 patent") and 5,103,996 ("the '996 patent") that relate to above-ground tanks for storing combustible materials. The original owner of the patents assigned them to Hoover Containment Systems, Inc. ("HCS") on August 31, 1994. On October 7, 1994, HCS sued a trade organization, Steel Tank Institute ("STI") and its members for infringement of certain patents, including the '949 and '996 patents. On June 1, 1995, STI and its members entered into a settlement agreement (the "Agreement") with HCS. Under the Agreement, HCS granted STI and its

members a non-exclusive license to use the '949 and '996 patents. On December 13, 1998, HCS merged with Containment Solutions, Inc. ("CSI"). As a result, CSI became the owner of the '949 and '996 patents.

STI is a trade organization that promotes the use of steel for various types of tanks. STI designs steel tanks of various types. STI "members" may join various "programs", which allow those members to use certain STI engineering designs and/or sell tanks under an STI label. One of these programs is the "Fireguard" program, which relates to certain double-walled tanks.[1] In order to become an STI member, a company must pay annual dues. An STI member may become a member of the Fireguard program by paying a one-time $25,000 fee.

In 2003, Plaintiff The Hall Patent Group ("HPG") notified STI and its members that they were infringing United States Patent No. 6,422,413, which was owned by HPG. In response to this notice, CSI sued HPG for infringement of the '949 and '996 patents.[2] CSI and HPG settled the suit. Later, CSI assigned the '949 and '996 patents to HPG.[3] In accordance with the Agreement, HPG licensed STI and its members to use the '949 and '996 patents.

In April 5, 2005, HPG brought this action against INCC for infringement of the '949 and

---

[1] Plaintiff contends that these tanks are covered by the '949 and '996 patents.

[2] CSI stated that an indemnity obligation between CSI and STI obligated it to sue HPG.

[3] In its brief, INCC states that it "disputes this assignment for the reasons stated in its response to [HPG's] Motion for Leave to File Second Amended Complaint. Although [HPG] has yet to establish the claim of ownership as to the Patents, [HPG's] ownership is assumed for the purposes of this Motion." If INCC were to establish that CSI did not effect the assignment of the '949 and '996 patents to HPG, HPG would not prevail on its patent infringement suit, unless it could establish title in another way. *See Ortho Pharm. Corp. v. Genetics Inst.*, 52 F.3d 1026, 1030 (Fed. Cir. 1995) (holding that the plaintiff must have legal title to the patent at the time of infringement) (citing *Crown Die & Tool Co. v. Nye Tool & Mach. Works*, 261 U.S. 24, 40-41 (1923)). However, besides raising the issue, Defendant's Motion does not support its contention with evidence or argument. As a result, the Court declines to consider the issue.

'996 patents. INCC alleges that, on June 17, 2005, it became a member of the STI Fireguard program. INCC filed a Motion for Summary Judgment on March 1, 2006, arguing that the Agreement licenses INCC to use the '949 and '996 patents.[4] HPG filed a Motion for Partial Summary Judgment on March 1, 2006, arguing that INCC has no valid license defense.

## STANDARD OF REVIEW

Summary judgment is warranted when the facts, as reflected in the pleadings, affidavits, and other summary judgment evidence, show that no reasonable trier of fact could find for the nonmoving party as to any material fact and that the law mandates summary judgment as a result. *See Pourgholam v. Advanced Telemktg. Corp.*, No. 3:01-CV-2764-H, 2004 U.S. Dist. LEXIS 10659, at *2-3 (N.D. Tex. June 9, 2004) (citing Fed. R. Civ. P. 56; *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986)). "The moving party bears the initial burden of identifying those portions of the pleadings and discovery in the record that it believes demonstrate the absence of a genuine issue of material fact, but is not required to negate elements of the nonmoving party's case." *Lynch Props., Inc. v. Potomac Ins. Co.*, 140 F.3d 622, 625 (5th Cir. 1998) (citing *Celotex*, 477 U.S. at 322-25). Once the movant carries its initial burden, the burden shifts to the nonmovant to show that summary judgment is inappropriate. *Fields v. City of S. Houston*, 922 F.2d 1183, 1187 (5th Cir. 1991).

The nonmovant is then required to go beyond the pleadings and designate specific facts that prove the existence of a genuine issue of material fact. *Matsushita Elec. Indus. Co. v. Zenith*

---

[4]As explained below, INCC argues that its membership in the STI Fireguard program conferred a license that was effective on June 1, 1995, and continues to be effective.

*Radio Corp.*, 475 U.S. 574, 587 (1986). That party may not rest on conclusory allegations or denials in its pleadings that are unsupported by specific facts. Fed. R. Civ. P. 56(e). The court must review all evidence in the record, giving credence to evidence favoring the nonmovant as well as "evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that evidence comes from disinterested witnesses" and disregarding the evidence favorable to the nonmovant that the jury is not required to believe. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 152 (2000). Further, "the court must draw all justifiable inferences in favor of the nonmovant." *Keelan v. Majesco Software, Inc.*, 407 F.3d 332, 338 (5th Cir. 2005).

In determining whether genuine issues of material fact exist, "factual controversies are construed in the light most favorable to the nonmovant, but only if both parties have introduced evidence showing that a controversy exists." *Lynch Props.*, 140 F.3d at 625. "If the record, taken as a whole, could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Friou v. Phillips Petroleum Co.*, 948 F.2d 972, 974 (5th Cir. 1991). However, in the absence of proof, a court will not conclude that the nonmoving party could prove the required facts. *Lynch Props.*, 140 F.3d at 625.

## ANALYSIS

Both parties agree that INCC's license defense hinges on the Agreement, which is governed by Illinois law. The Court must consider whether the Agreement is ambiguous, and whether the Agreement inures to the benefit of INCC due to its membership in STI's Fireguard

program.[5]

*1. The Agreement is not Ambiguous*

Under Illinois law, "the question of ambiguity is one of law to be determined by the court." *Sunstream Jet Express, Inc. v. Int'l Air Serv. Co.*, 734 F.2d 1258, 1266 (7th Cir. 1984). If a contract is unambiguous, there is no issue of material fact and a court must determine the contract's meaning as a matter of law. *Echo, Inc. v. Whitson Co.*, 52 F.3d 702, 705 (7th Cir. 1995). A contract is ambiguous only if it is reasonably and fairly susceptible to more than one meaning. *Id.* A disagreement between the parties as to the contract's meaning does not necessarily render it ambiguous. *Id.* A contract is not ambiguous merely because it fails to address some contingency; the general presumption is that the rights of the parties are limited to the terms expressed in the contract. *Consol. Bearings Co. v. Egret-Krohn Corp.*, 913 F.2d 1224, 1233 (7th Cir. 1990) (citing *In re Estate of Morrow*, 501 N.E.2d 998, 1002 (1986)). "The trial court must find a contract ambiguous, as a matter of law, before extrinsic and parol evidence is introduced at trial for consideration by the trier of fact." *Sunstream Jet Express*, 734 F.2d at 1267. However, "[i]n determining the issue of ambiguity, as a matter of law, the trial court may consider parol and extrinsic evidence." *Id.* at 1268.

INCC opposes HPG's Motion to Strike, but does not maintain that the Agreement is ambiguous. In its brief to support its Motion for Summary Judgment, INCC states that "even if" the Court finds the Agreement ambiguous, it should grant summary judgment in INCC's favor, citing the affidavits of Joseph Allwein and Wayne Geyer. Neither INCC nor HPG point the Court

---

[5]HPG admits that it is a successor in interest to the Agreement. Pl. Resp. to Request for Admissions No. 39.

to language in the Agreement that renders it ambiguous. *See Cent. Ill. Light Co. v. Home Ins. Co.*, 821 N.E.2d 206, 214 (Ill. 2004) ("[A] contract is not necessarily unambiguous when, as here, each party insists that the language unambiguously supports its position."). The Court has reviewed the Agreement, and finds it unambiguous. Because the Court finds the Agreement unambiguous, the Court need not look to extrinsic evidence of intent. *See Sunstream Jet Express*, 734 F.2d at 1267. Thus, the Court **GRANTS** Plaintiff's Motion to Strike, and **STRIKES** the affidavits of Allwein and Geyer, insofar as they purport to establish the intent of HCS and STI in entering into the Agreement.

*2. INCC's Contractual Rights*

The Agreement between HCS and STI granted STI certain rights related to the '949 and '996 Patents:

> 2.1 Subject to all of the terms and conditions of this Agreement, HCS hereby grants to STI and to each MEMBER the non-exclusive right under the HCS PATENTS[6] to make, use, have made, and sell COVERED PRODUCTS.[7]

Agreement § 2.1.[8] "Member" is defined at two places in the Agreement, at the beginning,[9] and at section 25.1:

---

[6] Both parties agree that "HCS Patents" includes the '949 patent and the '996 patent. *See* Agreement § 1.2.

[7] INCC has produced evidence that its purported infringing products are "Covered Products" under the Agreement. HPG has not submitted evidence to the contrary.

[8] "The rights granted under Section 2.1. above shall continue in effect, subject to the other terms and conditions of this Agreement, until the expiration of all of the HCS PATENTS . . ." Agreement § 2.2.

[9] The first paragraph of the Agreement defines "Members" as "the parties identified on Exhibit A". INCC does not claim to be identified on Exhibit A.

> 25.1 Any company that, after the EFFECTIVE DATE,[10] becomes a licensee of STI under STI's "Fireguard" program or any other program shall, upon executing a counterpart of this Agreement, be deemed to be a party hereto and to have all of the rights and obligations hereunder of a MEMBER, including without limitation the rights provided by the releases set forth in Article V hereof.

Agreement § 25.1. INCC alleges that it signed a counterpart of the settlement agreement on August 1, 2005, triggering Member status under section 25.1.[11]

Section 3.1 of the Agreement obliges each Member to pay a settlement payment of fifty dollars for each Covered Product made, used, or sold. However, that Section also states that this obligation ends when the total amount of settlement payments received equals $300,000.00.[12] Section 3.2 states that, if $300,000.00 in settlement payments are received prior to June 1, 2005, each member is obligated to pay a settlement payment of one dollar for each Covered Product made, used, or sold, until June 1, 2005.

HPG argues that the Agreement "is nothing more than a patent license agreement in which HCS granted a license under certain patents to manufacture certain products and in consideration STI and each of its members agreed to make certain payments (royalties)." Pl. Br. at 15. Further, HPG argues that the Agreement "is silent with respect to an entity who executes a counterpart **after** the ten year period in which royalties are required. . . . The question of whether there is a contract between the Late Joiner . . . and HCS . . . hinges on consideration, like any other contract." Pl. Br. at 16-17. The Court disagrees. Although there are similarities between the

---

[10] The effective date is defined as June 1, 1995. Agreement § 1.4.

[11] In its brief, INCC claimed to have signed a counterpart of the settlement agreement on August 1, 2005; however, the page cited to is blank. *See* Def. App. at 84. The Court notes that the signature page appears at page 94 of Defendant's Appendix, and that page shows that the counterpart was signed on July 28, 2005.

[12] STI and the Members paid an aggregate of $300,000 in settlement payments prior to June 1, 2005.

Agreement and a patent license agreement, the Court is bound to the express terms of the contract, not to some hypothetical patent license agreement. *See N. Trust Co. v. VIII S. Mich. Assocs.*, 657 N.E.2d 1095, 1104 (Ill. App. 1st Dist. 1995) ("Parties to a contract . . . are entitled to enforce the terms of the contract to the letter"). The question of whether a "Late Joiner" is entitled to enforce the terms of the Agreement is covered by Section 25.1; the Court need not look elsewhere.

HPG also argues that the Agreement is divisible, and such a finding affects whether INCC should be considered a party to the Agreement. *See* Pl. Br. at 14. Sections 3.1 and 3.2 of the Agreement require multiple entities to independently pay settlement payments according to their production or use of Covered Products. If one such entity did not pay as required by the Agreement, divisibility might be an issue to consider. *See Fid. & Deposit Co. v. Rotec Indus., Inc.*, 392 F.3d 944, 945 (7th Cir. 2004) ("[A] divisible contract is not two (or more) separate contracts; if it's broken, it's broken entirely. The only significance of its divisibility is that the contract price will be used to determine the value of any partial performance of the contract."). Even if the Agreement is divisible, the Court finds that Section 25.1 controls INCC's participation in the Agreement, and its obligations are governed by Sections 3.1 and 3.2.[13] *See*

---

[13]HPG notes that "[i]f the consideration was not severable or divisible between each of the members, the result of one member defaulting in royalty payments would constitute a breach of the entire agreement and thus give HCS the right to terminate all licenses for all members." Pl. Br. at 24. HPG argues that such a result "clearly could not have been the **intent** of STI and its members nor would it have been the **intent** of HCS had the question been put squarely to HCS". *Id.* (emphasis in original). The Court need not determine the effect of one Member breaching the Agreement, because neither party has alleged such a breach.

HPG also argues that there is no motivation for the original Members or STI to allow a new Member to join after June 1, 2005, without an obligation to pay royalties; thus, such an interpretation of the Agreement which provides otherwise is unsound. The Court disagrees. Section 25.1 of the Agreement states that a Member who joins after June 1, 2005, must become a licensee of an STI program, and must sign a counterpart to the Agreement. STI could demand substantial consideration for the right to become a member, and thereby a licensee, and, since

*Cent. Ill. Light*, 821 N.E.2d at 213 ("If the words used in the policy are clear and unambiguous, they must be given their plain, ordinary, and popular meaning.").

Section 25.1 states that if a company becomes a licensee of STI under one of its programs and executes a counterpart of the Agreement, then that company is "deemed to be a party hereto and to have all of the rights and obligations of a MEMBER". On June 17, 2005, INCC became a licensee of STI under its "Fireguard" Program. INCC signed a counterpart of the Agreement on July 28, 2005. Pursuant to section 25.1, INCC is deemed to have all of the rights and obligations of a Member.

INCC argues that, as a Member, one of its rights is listed in Section 5.1:

> 5.1 HCS hereby releases STI, the MEMBERS, and their respective licensees . . . from any and all claims, causes of action and liability in respect of the HCS PATENTS prior to the EFFECTIVE DATE, including any and all such claims and causes of action that are asserted by HCS in the INFRINGEMENT ACTION.

Agreement § 5.1.[14] INCC argues that, as a member, it retroactively gains the benefits of the release as to all events occurring before June 1, 1995 – the Effective Date. The express language of 5.1 – especially in light of Section 5.3[15] – shows that the Members are released from all causes of action which arose prior to June 1, 1995. *See also* Agreement § 25.1;[16] *Cent. Ill. Light*, 821

---

STI is a trade organization, the benefits of such consideration could be spread among all Members.

[14] Similarly, in Section 5.2, STI and the Members release HCS from "any and all claims, causes of action and liability in respect of [sic] the HCS PATENTS prior to the EFFECTIVE DATE". Agreement § 5.2.

[15] Section 5.3 recognizes that "The parties understand and agree that the releases provided in Sections 5.1 and 5.2 above are full and final releases covering all claims and causes of action between or among the parties in respect of the HCS PATENTS and arising prior to the EFFECTIVE DATE, whether such claims or causes of action are known, unknown, anticipated, or unanticipated." Agreement § 5.3.

[16] Section 25.1 states that the "rights and obligations" of a party deemed a Member under Section 25.1 "includ[es] without limitation the rights provided by the releases set forth in

N.E.2d at 213.

INCC argues that the combination of Sections 1.4[17] and 2.1[18] of the Agreement confers a prospective license from June 1, 1995. The Court disagrees. Section 2.1 gives Members the non-exclusive right to make, use, have made, and sell Covered Products. Therefore, after INCC became a Member, as defined by the Agreement, it had the right to make and sell Covered Products. With the exception of Section 5.1, nothing in the Agreement releases a Member from any liability incurred from the production or sale of Covered Products before that entity became a Member.[19] Section 2.1 only grants INCC the non-exclusive right to make, use, have made, and sell Covered Products from the date it became a Member -- July 28, 2005.[20]

Therefore, the Court finds that, as of July 28, 2005, INCC had a license to make, use, have made, and sell products that are covered by the '949 and '996 patents. Therefore, the Court **GRANTS** INCC's Motion for Summary Judgment as to any alleged acts of infringement that

---

[Sections 5.1-5.3] hereof."Agreement § 25.1.

[17] Section 1.4 states that "The term 'EFFECTIVE DATE' as used herein shall mean June 1, 1995."

[18] Section 2.1 is quoted above.

[19] Although Section 1.4 states that the Effective Date is June 1, 1995, that Section only lists the effective date of the Agreement. The Court declines to expand the language to encompass a retroactive grant of license rights. INCC notes that the signature page that it contends constitutes a counterpart to the Agreement, for the purposes of § 25.1, states that the counterpart is "Effective June 1, 1995". Def. App. at 94. The Court finds that such an inclusion on the signature page, which was not signed by or agreed to by HPG, does not retroactively grant license rights.

[20] INCC further argues that "[i]f . . . [INCC] was subject to some period of potential liability to [Plaintiff] for infringement of the ['949 and '996 Patents], then INCC, as STI's licensee, would have considerably less rights than STI. Such a circumstance would violated the express terms of the [Agreement], including, prominently, Sections 5.1 and 25.1.". Neither Section 5.1 nor Section 25.1 mandates that each Member must have exactly the same rights of STI. The Court declines to impute such a limitation into the Agreement.

occurred before June 1, 1995, and on or after July 28, 2005. The Motion is otherwise **DENIED**.

HPG's Motion for Summary Judgment is **GRANTED IN PART**. The Court finds that the Agreement did not confer a license to INCC for the period between June 1, 1995 and July 27, 2005. The Motion is otherwise **DENIED**.

*3. Attorney Fees*

INCC argues that it is entitled to attorney fees, citing the Agreement. Section 14.1 states:

> 14.1 If a legal action is initiated by any party to this Agreement against another, arising out of or relating to the alleged performance or non-performance of any right or obligation hereunder, or arising out of or relating to any dispute concerning the same, any and all fees, costs and expenses reasonably incurred by each successful party or his or its legal counsel in investigating, preparing for, prosecuting, defending against or providing evidence, producing documents or taking any other action in respect of such action shall be the joint and several obligation of and shall be paid or reimbursed by the unsuccessful party or parties.

Agreement § 14.1. Because this Order does not dispose of the instant lawsuit, it is premature to dub either party as the "successful party".[21] The Court denies INCC's request for attorney fees, without prejudice.

CONCLUSION

The Court **GRANTS** INCC's Motion for Summary Judgment as to any acts of alleged infringement that occurred before June 1, 1995, and on or after July 28, 2005. The Motion is otherwise **DENIED**. HPG's Motion for Summary Judgment is **GRANTED IN PART**, and the Court finds that the Agreement did not confer a license on INCC for the time between June 1,

---

[21] At this juncture, the Court declines to rule on whether the fact that INCC was not a Member as of the date HPG filed this lawsuit precludes the application of Section 14.1 to this case.

1995 and July 27, 2005. The Motion is otherwise **DENIED**.

**SO ORDERED.**

July 26, 2006.

　　　　　　　　　　　　　　　　　　_____
　　　　　　　　　　　　　　　　　　BARBARA M.G. LYNN
　　　　　　　　　　　　　　　　　　UNITED STATES DISTRICT JUDGE
　　　　　　　　　　　　　　　　　　NORTHERN DISTRICT OF TEXAS